IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

BRIAN WINGER,                       )
                                    )
            Plaintiff,              )
                                    )
    v.                              )    Case No. 07-3073-CV-S-REL-SSA
                                    )
MICHAEL ASTRUE, Commissioner        )
of Social Security,                 )
                                    )
            Defendant.              )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Brian Winger seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ's residual functional capacity assessment is not supported by the record; (2) the job of wire patcher, found by the ALJ to be one that plaintiff can perform, requires a Level 2 reasoning, yet the ALJ limited plaintiff to following only simple instructions, and the job of food and beverage order clerk requires the ability to deal with people, but the ALJ found that plaintiff should have minimal public contact and no customer service; and (3) the ALJ improperly found plaintiff's complaint of pain not credible. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On September 18, 2004, plaintiff applied for a period of disability and disability insurance benefits alleging that he had been disabled since August 2, 1998. Plaintiff's disability stems from a back disorder. Plaintiff's application was denied on December 16, 2004. On March 16, 2006, a hearing was held before an Administrative Law Judge. On May 11, 2006, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 27, 2006, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera

2

Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion

3

shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

4

5.   Does the impairment prevent the claimant from doing any other work?

                    Yes = disabled.
                    No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff, his wife, and vocational expert Michael Lala, in addition to documentary evidence admitted at the hearing.

### A.   *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1987 through 2005:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1987 | $ 2,218.57 | 1997 | $20,948.16 |
| 1988 | 4,385.85 | 1998 | 22,714.26 |
| 1989 | 3,677.16 | 1999 | 7,814.00 |
| 1990 | 5,225.27 | 2000 | 0.00 |
| 1991 | 6,343.78 | 2001 | 0.00 |
| 1992 | 2,316.03 | 2002 | 0.00 |
| 1993 | 9,291.52 | 2003 | 0.00 |
| 1994 | 12,464.30 | 2004 | 10,267.43 |
| 1995 | 13,763.64 | 2005 | 0.00 |
| 1996 | 14,584.44 | | |

(Tr. at 73).

5

**Function Report**

In a Function Report completed by plaintiff on October 22, 2004, he reported that his daily activities include making phone calls and "errands", research on the computer for about an hour, "complete errands for the day", and then repeat the scenario (Tr. at 98). He reported that he needs help putting on his pants, socks, and shoes, and he needs help washing his lower extremities (Tr. at 99). He cooks about once a week and it takes two hours (Tr. at 100). He is able to iron, mow, vacuum, and do some repairs (Tr. at 100). He goes outside every day, he is able to drive a car, he shops about once a week (Tr. at 101). When asked how long he can walk before needing to rest, he wrote "depends", and when asked how long he can pay attention, he wrote "depends" (Tr. at 103). He reported that he can follow both written and oral instructions well (Tr. at 103). He then concluded with: "I attended a four year vocational rehabilitation program through the federal government, but failed due to increased pain severity and secondary symptoms that arose. . . . Self employment is only option, but credit history forbids further action." (Tr. at 105).

**Letter to Whom it May Concern**

On March 15, 2006, Carolyn Winger, plaintiff's mother, wrote a letter to whom it may concern (Tr. at 121). She wrote that plaintiff has trouble getting in and out of his vehicle, that the groceries and laundry are carried by his wife. When he goes to

6

the theater, he is in extreme pain by the time the show is over.
Driving is difficult for him, and he has used all sorts of
cushions to help ease his pain.  He gets depressed because his
pain takes away life's pleasures.

## B.    *SUMMARY OF TESTIMONY*

During the March 16, 2006, hearing, plaintiff testified; his
wife, Carrie Winger, testified; and Michael Lala, a vocational
expert, testified at the request of the ALJ.

## 1.    **Plaintiff's testimony.**

Plaintiff testified that he was born in 1970 which would
make him currently 37 years of age (Tr. at 264).  He graduated
from high school and has some college (Tr. at 264).  Plaintiff is
five feet nine inches tall and weighs 180 pounds (Tr. at 265).

Plaintiff injured his back in the military (Tr. at 268).  He
was in the Navy, maintaining aircraft, and he had to carry items
weighing 100 to 150 pounds (Tr. at 268-269).  He had to do this
kind of lifting about 30 times per day (Tr. at 269).  They asked
him if he wanted to get an evaluation for a medical discharge,
but he said no because he enjoyed the Navy (Tr. at 269).  He
finished his four years in January 1997, and he received a VA
disability rating about three months later (Tr. at 269).

Plaintiff got a job rebuilding aircraft, making wings and
fuselage (Tr. at 270).  He left that job in August 1998 because
of his back, was awarded a Chapter 31 vocational rehabilitation

7

at Metropolitan State College of Denver, and they determined that he could not do the rebuilding job anymore (Tr. at 270). Plaintiff was studying information technology, but he could not finish the degree because he could not sit through the classes (Tr. at 271). Plaintiff made it to senior status in college, and was within 30 credit hours of getting his degree (Tr. at 271).

Plaintiff recently asked his doctor for a cane and he uses it in his right hand (Tr. at 265). Plaintiff has a driver's license and sometimes drives himself on errands and to appointments (Tr. at 266). He cannot drive for extended periods of time (Tr. at 266).

Since his alleged onset of disability on August 2, 1998, he has worked intermittently (Tr. at 266). He worked for the Department of Veterans Affairs in Denver for four or five months in 2004, he worked for the Branson Veterans Task Force in 2005, and he has done volunteer work (Tr. at 266). Plaintiff cannot go back to his previous work because he used his back a lot (Tr. at 267). He needed a lot of strength and the ability to twist (Tr. at 267). Plaintiff cannot stand for long periods of time, and he cannot sit for long periods of time (Tr. at 267). Plaintiff left his job at the VA in Denver because he was required to sit eight hours per day and he could not do that (Tr. at 268, 272). Plaintiff was missing about two days of work per week during bad weeks (Tr. at 272). Plaintiff had no boss, he was the only

8

employee and reported to a board panel made up of veterans, most of them disabled (Tr. at 273).

At the time of the hearing, plaintiff was still working at Adventure Creations doing computer work (Tr. at 274). He works five to eight hours per week (Tr. at 274). He sets his own hours when he is able (Tr. at 274). He is the information technology person who takes care of the computers for graphics artists (Tr. at 275).

Plaintiff's pain radiates down his leg into his foot all the time (Tr. at 275). His pain is about a seven on a scale of one to ten (Tr. at 276). Sitting too long, standing too long, and walking too far all aggravate his pain (Tr. at 276). Cold, humid weather also makes his pain worse (Tr. at 276). Plaintiff does stretching exercises for his back, and he tries to lie in neutral positions, usually with his feet propped up (Tr. at 276). As a result of his medication, plaintiff experiences constipation, drowsiness, dizziness, and forgetfulness (Tr. at 267).

While in the military, plaintiff lost parts of his fingers on his right hand (Tr. at 277). He is right-handed (Tr. at 277). The fingers were reattached, but plaintiff does not have the same amount of feeling in the fingers (Tr. at 277). He does not have problems holding or grasping, but he is limited to "touch sensation" (Tr. at 277).

Case 6:07-cv-03073-REL   Document 13   Filed 01/29/08   Page 9 of 45

Plaintiff goes to bed at about 3:00 in the morning (Tr. at 278). He sleeps for two to six hours (Tr. at 278). He stays up that late because of pain (Tr. at 278). Although plaintiff does not have trouble staying awake, he believes his focus and concentration are down (Tr. at 279). He is stiff; and although he gets up at around 9:00 a.m., it takes him two to three hours before he can walk around the house (Tr. at 280). Plaintiff cannot put on his pants or shoes, and it is hard for him to wash the lower half of his body in the shower (Tr. at 280).

Plaintiff gets depressed and frustrated because he cannot do what a 35-year-old man should be able to do (Tr. at 279).

Plaintiff recently began using a cane to help with his pain (Tr. at 281). In the past he fell about two or three times a month (Tr. at 281).

Plaintiff saw a surgical consult, but he was advised not to have back surgery because the doctor said he would have even more pain six months down the road (Tr. at 282). He said his doctor recommended he wait about ten years until a newer surgical technique now being used in Germany would be available in the United States (Tr. at 282-283). That surgery is through the stomach instead of through the back (Tr. at 282).

Plaintiff can sit for about five minutes before he needs to shift his weight around due to pain (Tr. at 284). He can sit for about 15 minutes before he needs to get up (Tr. at 284). He can

10

stand for a couple of minutes before needing to shift his weight (Tr. at 286). He can only stand for a total of about 20 minutes per day (Tr. at 286). He can lift less than five pounds frequently and about five pounds occasionally (Tr. at 287). Plaintiff estimated that in 1998 at his alleged onset date, he could have sat for about a half an hour at a time, and he could have stood for about a half an hour at a time (Tr. at 287-288). He could only stand for about an hour per day total, which is why he went through vocational rehabilitation, to get a job where he did not have to stand or bend (Tr. at 288). Back in 1998, he could lift a couple more pounds than now, but not much more (Tr. at 288-289). Plaintiff's ability to sit, stand, and lift was the same in 2004 as now.

Plaintiff needed to lie down or recline about two hours per workday back in 1998 and about four hours per work day in 2004 to the present (Tr. at 290-291).

## 2. Carrie Winger's testimony.

Carrie Winger, plaintiff's wife, testified that they have been together since 1999 (Tr. at 293). She has had to help plaintiff get his pants on since before March 2005[1] (Tr. at 292). Mrs. Winger now does the yard work, but plaintiff had done "very, very little" of it before (Tr. at 292-293). She took over raking

---

[1]Mrs. Winger said during the March 16, 2006, hearing that she had had to help plaintiff put his pants on for "over a year" (Tr. at 292).

Case 6:07-cv-03073-REL   Document 13   Filed 01/29/08   Page 11 of 45

the leaves (Tr. at 293). Mrs. Winger takes out the trash, but she always did that (Tr. at 293). Plaintiff does not like to be around anyone when he is hurting (Tr. at 294).

**3.   Vocational expert testimony.**

Vocational expert Michael Lala testified at the request of the Administrative Law Judge. Plaintiff has worked as a helicopter mechanic and an airplane mechanic, both at the very heavy level and considered a medium skilled level as usually performed (Tr. at 295). His job at the VA was claims clerk I, nationally classified as sedentary, semi skilled (Tr. at 295).

The first hypothetical involved a person 27 to 35 years of age; with more than a high school education; who could do no more than sedentary work; should avoid climbing and exposure to significant unprotected heights, machinery, and commercial driving; would need to work in a climate-controlled environment and avoid extremes of temperature and humidity; must work only on even surfaces; must have no exposure to extreme vibration; must be able to alternate sitting and standing at 30-minute intervals; could perform no more than simple, repetitive work; and must have only minimal contact with the public (Tr. at 295-296). The vocational expert testified that this person could not perform plaintiff's past relevant work (Tr. at 296). He testified that the sedentary work base would be eroded by 70% based on the restrictions (Tr. at 297). However, the person could be a wire

12

patcher, D.O.T. 723.687-010, with 2,000 jobs in the four-state
region (Missouri, Iowa, Nebraska, and Kansas), and with 127,000
jobs in the nation (Tr. at 297). The person could also be a food
and order beverage clerk, D.O.T. 209.567-010, with 4,900 in the
region and 184,000 in the country (Tr. at 297).

The second hypothetical involved a person with the
limitations described by plaintiff, who could not sustain eight
hours of sitting, standing and walking at any exertional level
(Tr. at 297). The vocational expert testified that such a person
could perform no work (Tr. at 297).

Plaintiff's attorney then added to the first hypothetical an
inability to feel with the right hand and the need to use an
assistive device in the right hand (Tr. at 298). The vocational
expert testified that the sedentary job base would be eroded by
85 to 92 percent, but that the person could still perform the job
of food and beverage clerk (Tr. at 298). A food and beverage
clerk would either have to hold a phone or use a headset and key
in the orders using pictures (Tr. at 299). Reaching and handling
are significant, but feeling is not significant for that job (Tr.
at 299).

The next hypothetical restricted the person in the previous
hypothetical to no bending (Tr. at 299). The vocational expert
testified that the position of food and beverage clerk does not
require an ability to bend (or stoop) (Tr. at 299-300).

13

C.    *SUMMARY OF MEDICAL RECORDS*

August 2, 1998, is plaintiff's alleged onset of disability.

On September 8, 1999, plaintiff was seen by Stephen Roth, R.N., for lower back pain, increasing over the past two months (Tr. at 163). "Sitting, standing, and bending over have made this worse." He was not on any medications. He was assessed with lower back pain, and the plan was listed as "screening".

There are no relevant medical records for the next 17 months.

On February 5, 2001, plaintiff saw Eric Rodgers, M.S.N., a family nurse practitioner, to establish care (Tr. at 154-159). Plaintiff reported living in a ground floor apartment with his second wife, her two children (ages six and eight) and his two children (ages three and six) who live with him half the year. Plaintiff was smoking 3/4 pack of cigarettes per day and had for 12 years. He reported drinking alcohol about four times per week. He reported having previously used drugs, but said he quit. Plaintiff was taking Motrin 1200 mg for back pain, and Tagamet for reflux. He had no memory loss, no depressed mood, and a normal gait. His depression screen was negative. He was assessed with hypertension, tobacco abuse, and chronic lower back pain. Plaintiff was given handouts about ways to improve his back pain and ways to improve his diet. He was given a prescription

14

for Motrin, 800 mg[2], and was told not to take 1200 mg at a time. He was given a smoking cessation consult.

On February 9, 2001, plaintiff saw Lynne Koerner, a nurse practitioner, for smoking cessation counseling (Tr. at 154). He had previously quit for a year, but resumed smoking. He was smoking 3/4 to one pack per day. Ms. Koerner discussed treatment options with plaintiff, and gave him some Zyban.

There are no relevant medical records from February 2001 until October 2002, nearly 21 months later.

On October 24, 2002, plaintiff saw Eric Rodgers, Ph.D., a family nurse practitioner, requesting a refill of Ibuprofen (Tr. at 152-153). "Last seen by me 2/5/01 for initial visit. Reports no change in health status. Has been taking Ibuprofen 800 mg 1 tab 2-3 times weekly for LBP [lower back pain]. States [he] has been exercising and following better diet since last visit. Has noticed improvement in blood pressure and back pain. Quit smoking x 6 months but resumed up to 6 cig/day. Still student at Metro State in computer science." Plaintiff had full range of motion in his back. He was tender over both sacroiliac joints, righter greater than left. Rodgers assessed chronic lower back pain, stable. He ordered lab work, refilled plaintiff's Ibuprofen 800 mg (180 tablets with three refills).

---

[2]Over-the-counter Motrin (ibuprofen) is 200 mg per tablet.

There are no relevant medical records during the next four months.

On February 25, 2003, plaintiff saw Patricia Hughes, a nurse practitioner, for a backache along with other unrelated complaints (Tr. at 149-150). He stated that he needed something for his back and he does not see his primary care physician until April (Tr. at 151). Plaintiff reported that staying in the same position for a prolonged time increases his pain. Ibuprofen 800 mg three times a day was not helping. Ms. Hughes noted that plaintiff's 1997 lumbar spine film showed mild disk narrowing at L2-3, minimal amount of retrolisthesis[3] of L5 on S1. She noted that he smokes and drinks alcohol socially. He was able to walk on toes and heals and do squats. Straight leg raising on the right produced lower back pain. She assessed chronic low back pain. Plaintiff was given prescriptions for ibuprofen, Robaxin (a muscle relaxer), and Vicodin[4], and he was told to do strengthening exercises. He was discharged in good condition.

On April 4, 2003, plaintiff was seen by Eric Rodgers, Ph.D., a family nurse practitioner, for a follow up on chronic low back pain (Tr. at 147-148). "Reports doing better. States [he] had [an] episode [the] end of February of increased LBP [lower back

---

[3]Retrolisthesis is the relative posterior displacement of vertebra on the one below it.

[4]Acetaminophen (Tylenol) and hydrocodone (a narcotic analgesic).

16

pain] with spasms and pain shooting down right leg to knee that last[ed] about 2-3 weeks. Has increased exercise and stretching which seems to help. Also doing more hot soaks for stiffness relief. Using Ibuprofen on regular basis but not daily. Would like to try not using meds and see how he does."

Plaintiff reported his pain a four on a scale of one to ten. Forward flexion[5] was limited to 35° by pain. He could side bend without problems bilaterally. He had point tenderness over his right sacroiliac. He was diagnosed with chronic lower back pain, stable. "Discussed chronic nature at great length and use of NSAIDS [nonsteroidal anti-inflammatories] for pain relief. OK to not use meds, he can call and let me know if [he] needs to resume NSAIDS for pain relief. If [he] does, will change to Naprosyn 250 mg BID [twice a day]. Positive reinforcement given for exercise/stretching."

On May 23, 2003, plaintiff was seen by Teresita Marcelo, M.D., for a disability examination[6] (Tr. at 145-147). His last disability evaluation had been on October 8, 1997. Plaintiff reported he was a full-time computer information systems student. He reported that he was alternating Motrin 800 mg with Naprosyn 500 mg (both nonsteroidal anti-inflammatories), and he was also

---

[5]Bending forward at the waist, normal is 90°.

[6]This was apparently related to his military disability, as he had not yet filed an application for Social Security disability.

taking Vicodin (narcotic analgesic) as needed for severe pain.
Plaintiff was previously diagnosed with degenerative joint
disease of the lumbosacral and thoracic spine. He had complained
of pain on a daily basis which is worse at night. "It flares up
once a week. The pain is increased by lying down for a long
period of time. . . . Walking seems to aggravate the back pain
if he walks for a long time. Standing and sitting too long also
increases the back pain. Lifting anything more than 50 pounds
increases the back pain."

Plaintiff reported that he was exercising twice a week,
doing cardiovascular exercise and stretching exercises, which
"seems to help." Dr. Marcelo performed a physical examination
and noted that plaintiff was in no acute distress. He had no
tenderness or spasms in the back. "Forward bending 60 degrees
with pain [normal is 90°], lateral bending right 30 degrees with
pain across the lower back [normal is 25°], left 30 degrees with
pain across the lower back, extension 38 degrees with pain,
rotation left and right 35 degrees with associated pain across
the lower back. Straight leg raising sitting [and] supine is
negative bilaterally."

Dr. Marcelo diagnosed "thoracolumbosacral spine with
degenerative disk disease and degenerative joint disease and
limited motion". She wrote, "I would assign an additional 10-15
degree loss of flexion because of flareups and pain with repeated

18

use.  No fatigue, no weakened movement."

On July 26, 2003, plaintiff was seen by Mary Gray, M.D., for presumed strep (Tr. at 141-142).  He had been to the dentist to have a tooth pulled and was told he might have strep (Tr. at 145).  "He also has chronic pain back.  Has been to back school and take[s] naproxen for this."  Plaintiff's gait was normal.  He was given 10 Vicodin to take as needed for pain.

There are no relevant medical records for the next six months.

On January 21, 2004, plaintiff was seen in the emergency room due to increased low back pain with shooting, burning pain down his right leg and buttocks for two weeks (Tr. at 137-139). He reported difficulty sleeping the last two nights due to pain when rolling over, reported pain with getting in and out of a car, getting up and down, and walking up stairs.  He reported that Naproxen (nonsteroidal anti-inflammatory), Robaxin (muscle relaxer), and ibuprofen, up to 1600 mg[7] at a time, not helpful. He reported he smokes, drinks alcohol socially, and had been a student of computer science for the past year.  Straight leg raising on the right produced back pain.  Plaintiff had x-rays of his lumbosacral spine (Tr. at 130).  Dr. Elliott Sandberg found multilevel degenerative disc disease.  Plaintiff was diagnosed with chronic lower back pain with acute right sciatica.  He was

---

[7]Over-the-counter Ibuprofen is 200 mg per tablet.

19

prescribed Naproxen, Flexeril (a muscle relaxer), and Vicodin
(narcotic analgesic), and was provided with a physical therapy
consult.

Also on January 21, 2004, plaintiff's previous physical
therapy consult was discontinued (Tr. at 133). "He was sent a
letter stating that if he was interested in scheduling a physical
therapy evaluation, he was asked to call the PM&RS office within
3 weeks for a specific appointment time. The appropriate dates
were stated in the letter as well as the hospital's toll free
number. This veteran did not respond in the 3 week time frame.
Therefore, as stated in the letter, this consult will be
discontinued."

On April 30, 2004, plaintiff had an MRI of his lumbar spine
due to right sciatica for five months and chronic low back pain
for years (Tr. at 124-125, 127-128). Dr. Michele LaJaunie found
a multilevel degenerative change, disc space narrowing and a
diffuse disc bulge at L4-L5, central disc herniation which
results in "borderline to mild spinal canal stenosis and may
affect either L5 nerve root in the ventral canal."

On May 5, 2004, plaintiff was offered physical therapy for
his chronic lower back pain with sciatica (Tr. at 137).
Plaintiff agreed, and a physical therapy consult was placed.

On May 20, 2004, plaintiff was seen by Patricia Hughes, a
nurse practitioner in the emergency room (Tr. at 134-135).

20

Plaintiff complained of back pain since 1994, worse during the past five months. "Prolonged sitting and standing and rolling over in bed brings on the pain. Squatting and laying [sic] supine with his legs elevated alleviates the pain. . . . Ibuprofen 1600 mg[8] qd [once a day] helps a little but he doesn't like taking so much. Muscle relaxers do not help and cause fatigue."

The notes state that plaintiff smokes and drinks alcohol socially. "Working at the VA for 2.5 months doing desk work, vocational rehab through the VA." Straight leg raising on the right produced back pain, lumbar flexion (bending over at the waist) produced back pain. Plaintiff was prescribed Vicodin (a narcotic analgesic) and Ibuprofen (anti-inflammatory) as needed for pain.

On June 17, 2004, plaintiff's physical therapy consult was discontinued (Tr. at 133-134). "He was sent a letter stating that if he was interested in scheduling a physical therapy evaluation, he was asked to call the PM&RS office within 3 weeks for a specific appointment time. The appropriate dates were stated in the letter as well as the hospital's toll free number. This veteran did not respond in the 2 [sic] week time frame. Therefore, as stated in the letter, this consult will be discontinued."

---

[8]200 mg of Ibuprofen is the over-the-counter dose.

On July 19, 2004, plaintiff had an EMG[9], and all muscles studied were normal (Tr. at 132).

On September 15, 2004, plaintiff saw John Elms, M.D., in the emergency room complaining of low back pain and right leg pain (Tr. at 165). Plaintiff had been seen at the VA in Denver but recently moved to Missouri and was told to go to the ER to be seen. "He does have a MRI report that does show some bulging disc and one level that it reportedly impinges on the thecal sac, but does not put any apparent pressure on a nerve." Plaintiff was tender in the right sacroiliac area, lower back was nontender, "[h]e seems to move both lower extremities well." He reported that all of his toes felt tingly except his little toe. He was diagnosed with low back and right leg pain.

On September 18, 2004, plaintiff applied for disability benefits.

On September 30, 2004, plaintiff saw James Simmons, M.D., in urgent care for a refill on his medication (Tr. at 182-184, 189-190). He indicated he had not been sad or depressed much of the time in the past two weeks. He reported that he had been unable to sleep. His condition was listed as satisfactory. Straight leg raising was 20 degrees bilaterally, flexion and extension of

---

[9] An electromyogram (EMG) measures the electrical impulses of muscles at rest and during contraction. Measuring the electrical activity in muscles and nerves can help find diseases that damage muscle tissue or nerves.

spine 30 degrees, had good muscle strength in lower extremities. He was diagnosed with chronic back pain, and his medications were refilled.

On October 11, 2004, plaintiff was discharged from physical therapy (Tr. at 167). Plaintiff was seen for two visits with two no-shows, his last visit being July 14, 2004. The note indicated that his objective measures were unknown as he stopped coming and had no contact with the physical therapist since his second visit. On his first visit, July 12, 2004, he was observed to have an antalgic gait[10]. On his last visit, he had reported that his back felt "a little better" (Tr. at 169).

On October 18, 2004, plaintiff was seen by David Kastner, M.D., to establish care (Tr. at 179-182, 185-187). Plaintiff was taking Cyclobenzaprine (muscle relaxer, brand name is Flexeril) for muscle spasms, hydrocodone (narcotic analgesic) for pain, and Ibuprofen 800 mg for pain. Plaintiff reported smoking 1/2 pack of cigarettes per day, and he declined treatment for smoking. He was counseled on smoking cessation. Plaintiff had a normal gait. Plaintiff was told to continue taking Vicodin, Flexeril, and Ibuprofen for his back pain. He was counseled on diet and exercise.

---

[10]A characteristic gait resulting from pain on weightbearing in which the stance phase of gait is shortened on the affected side.

Aside from two doctor visits in connection with his Social Security disability application, plaintiff has no relevant medical records for the next eight months.

On December 3, 2004, plaintiff was seen by Dewey Ballard, M.D., for a disability assessment (Tr. at 191-197). Plaintiff complained of back pain since 1994, worse with sitting, standing, or bending activities. He reported having trouble putting on his shoes, and said that his wife helps him do that. He reported numbness in his legs if he has been sitting. "He has had no weakness or falling." He was taking ibuprofen 800 mg twice a day, Flexeril, and Vicodin as needed. Plaintiff had some difficulty doing a squat. He had limited flexion of the lumbar spine (forward flexion was 60° with normal being 90°, lateral flexion was 15° with normal being 25°). Straight leg raising was negative on the left, positive on the right at 60°. His effort was listed as "fair". He was able to stand on toes and heels. There was no muscle weakness or wasting in the lower extremities and no sensory changes. His gait was slow with no limps. He had difficulty getting of and on the exam table and appeared to be in pain. "This young man has a herniated L4/L5 disc documented on MRI earlier this year. Findings on physical exam are consistent with that. He seems to be quite impaired and would have difficulty doing jobs requiring prolonged sitting or standing.

24

He would have difficulty doing bending activities or carrying loads."

Dr. Ballard was asked on the form to describe plaintiff's ability to sit, stand, walk, lift, carry, handle objects, and travel, but he wrote only, "see letter". Dr. Ballard wrote that plaintiff had no mental problem that would impact his ability to perform basic tasks and make decisions required for daily living.

On December 13, 2004, Lester Bland, Psy.D., a psychologist, completed a Psychiatric Review Technique (Tr. at 198-211). He found that plaintiff had no medically determinable impairment. "Claimant makes no initial complaints of limitations due to psychologically based symptoms. ADL's [activities of daily living], complains of limitations in concentrating, getting along with others and completing tasks. Claimant reports he follows instructions well. Reports physical pain interferes with concentration; although, has no problems managing finances. Claimant as well reports pain interferes with patience with others. Although shops, drives, spends time with others. Claimant reports on DL's he has anxiety and depression. However, does not complain of symptoms to TS [treating sources]. TS MER 10/18/04 depression screen - neg. Claimant has sought no treatment for psy. related symptoms. No positive findings noted on recent examination. No MDI [medically determinable impairment] established."

On December 16, 2004, plaintiff's application for disability benefits was denied.

December 31, 2004, is plaintiff's last insured date.

On June 10, 2005, plaintiff was seen by Dennis Perryman, D.O., complaining of dizzy spells and palpitations, and he reported that he "feels like he is depressed due to chronic low back pain." (Tr. at 241-246). He reported that he was sleeping three to four hours per night. He was drinking three to four cups of coffee and smoking a half a pack of cigarettes per day. Plaintiff's gait was normal, his digits were normal, he had normal grip. Straight leg raising was positive at 30 degrees on the right, 60 degrees on the left. He was oriented times three, his memory was intact, his mood was normal. He was assessed with depression with chronic pain contributing, chronic low back pain, and tobacco abuse. He was told to exercise 20 minutes four times per week minimum and to stop smoking.

On July 21, 2005, plaintiff attended a depression education class (Tr. at 222, 241). The topics covered included definition and causes of depression, symptoms of depression, the difference between depression and normal sadness, treatment and personal management of depression. A videotape on depression was shown and class discussion followed.

On August 1, 2005, plaintiff saw Dennis Perryman, D.O., for a follow up on depression (Tr. at 228-229). He said he had

26

stopped taking amitriptyline (an antidepressant) because it was too sedating and he said it made his muscles feel stiff and sore. There is a "?" typed by this statement in the record. Plaintiff's gate was normal, his fingers were normal, his joints were normal. Dr. Perryman decreased plaintiff's amitriptyline to 12.5 mg and added Flexeril. Jeanne Silvestri, R.N., recorded that plaintiff's last three pain scores were as follows:

October 18, 2004 - 4

June 10, 2005 - 6

August 1, 2005 - 6

She wrote, "Patient does not desire chronic pain to be addressed at this time." He was counseled to stop smoking (Tr. at 221-222, 230).

On August 19, 2005, plaintiff saw Dr. Ranier Birk for a "check up of his depression and anxiety" as well as chronic back pain and insomnia (Tr. at 219-220, 223-228). The nurse had completed a psychiatric screening and found it positive based on plaintiff's answers. "Range of motion limited to all movements particularly to flexion of the lumbar spine. . . . Psychiatric - normal judgment and insight. Patient is oriented to person, place, and time. Recent and remote memory is normal. No depression, anxiety, or agitation was noted."

Plaintiff denied new pain, reported only chronic pain. He reported he had had pain in his low back for the past 11 years.

27

He rated his pain a five on a scale of one to ten.  He reported that standing or sitting too long aggravates his pain.  He was counseled to quit smoking.  The doctor's report ends in the middle of a sentence and I have been unable to locate the remainder of this record in the transcript (Tr. at 220).

On September 2, 2005, plaintiff saw Dr. Ranier Birk to establish a relationship with a new physician (although plaintiff had seen Dr. Birk two weeks earlier) (Tr. at 238, 239).  "He currently has no problems.  He does complain of chronic lumbar pain, which he has learned to live with."  He was counseled on smoking cessation.  This record ends in the middle of a sentence, and I have been unable to find the rest of the record in the transcript (Tr. at 238).

On September 8, 2005, plaintiff saw Dr. Birk for a dental abscess (Tr. at 237).  Dr. Birk performed a physical exam and wrote the following:  "Musculo - normal gait and station, no misalignment, asymmetry, crepitus [a crackling sound] or contractures[11] were noted.  Stability is normal, no subluxation[12], dislocation, or laxity was noted.  Muscle strength and tone were normal.  No atrophy or abnormal movements were noted. . . . Psychiatric - normal judgment and insight.  Patient is oriented

---

[11]Static muscle shortening due to tonic spasm or fibrosis, loss of muscular balance, etc.

[12]An incomplete dislocation; though a relationship is altered, contact between joint surfaces remains.

28

to person, place, and time.  Recent and remote memory is normal.
No depression, anxiety, or agitation was noted." Plaintiff was
assessed with dental abscess and was given Clindamycin (an
antibiotic) and told to find a dentist.

On September 21, 2005, plaintiff called Dr. Birk's office
asking to speak to the doctor about hydrocodone (Tr. at 218).
Mandy Cope, R.N., called plaintiff back, but he was at work so
she talked to plaintiff's wife and told her a temporary
prescription had been called in to last until his mail order
prescription arrived.

On December 15, 2005, plaintiff called Mandy Cope, R.N.,
requesting a "refill of hydrocodone - no complaints" (Tr. at
217).  The record states that Dr. Birk was notified, but it does
not indicate whether the medication was refilled.

On March 8, 2006, a cane was shipped to plaintiff (Tr. at
248).  Plaintiff's administrative hearing was held eight days
later.

**V.   *FINDINGS OF THE ALJ***

Administrative Law Judge Linda Carter entered her opinion on
May 11, 2006 (Tr. at 20-27).  She noted during the hearing that
plaintiff's last insured date was December 31, 2004 (Tr. at 262).

Step one.  The ALJ found that plaintiff has not engaged in
substantial gainful activity since his alleged onset date, and

29

that his work activity after the alleged onset date constituted an unsuccessful work attempt (Tr. at 22).

Step two. The ALJ found that plaintiff's back impairment is severe (Tr. at 22). However, plaintiff's history of reattached fingers and depression/anxiety are not severe impairments (Tr. at 22).

Step three. Plaintiff's impairment does not meet or equal a listed impairment (Tr. at 22).

Step four. The ALJ found that plaintiff retains the residual functional capacity to lift and carry up to ten pounds; sit with normal breaks for six hours per day; stand and walk for two hours per day; must be able to alternate sitting and standing at 30-minute intervals; must work on an even surface; may not have exposure to extreme level of vibration, no unprotected heights, no dangerous unguarded moving machinery, and no commercial driving; no extreme temperatures or humidity; and secondary to possible distraction from pain, he is limited to work that is simple and repetitive in nature (i.e., involves only one-, two-, or three-step instructions) and involves minimal public contact and no customer service (Tr. at 24).

With that residual functional capacity, plaintiff cannot return to his past relevant work (Tr. at 25).

Step five. Plaintiff can perform the jobs of wire patcher and food and beverage order clerk, both of which are available in

30

significant numbers in the national and regional economies (Tr. at 25).  In addition, the ALJ found that plaintiff, as a younger individual with a high school education and the capacity to perform sedentary work, can perform "many [of] the jobs of which administrative notice has been taken by the Commissioner." (Tr. at 26).

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment

31

unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> A nurse practitioner who examined the claimant in February of 2001 noted that he reported smoking cigarettes and engaging in a minimal amount of exercise.  The claimant also stated that he was currently attending college.  The claimant told the nurse practitioner in October of 2002 that he had begun exercising and that this had relieved his back pain to some extent.  He similarly stated in April of 2003 that increased exercise helped his back pain.  The claimant's primary health care records indicate that he took only ibuprofen for pain relief until approximately February of 2003, when he was prescribed Vicodin.

32

In January of 2004, the claimant was referred for physical therapy, but did not follow through with the referral. He was referred to a physical therapist again in May of 2004 and was scheduled for two sessions, but did not keep either appointment. A pharmacist's note dated October 18, 2004, states that the claimant had been prescribed cyclobenzaprine for muscle spasms, hydrocodone for severe pain, and ibuprofen for pain and inflammation. A primary care registered nurse noted at that same time that the claimant continued to smoke cigarettes and had declined referral to a smoking cessation program.

. . . . In completing a questionnaire required by the social Security Administration as part of the application for benefits, the claimant stated that he was able to do errands, use a computer, do exercises, prepare meals, iron clothing, vacuum, do some home repair jobs, leave his residence on a daily basis, drive a car, go shopping, manage his finances and socialize with friends or relatives. These statements show that he engages in a fairly normal range of daily activities and are inconsistent with his allegation of disability.

The medical records, moreover, do not support the claimant's allegation that he is disabled. The claimant has a long history of complaints of back pain and has been diagnosed with degenerative disc disease of the lumbar spine, including a disc herniation at L4-5 that results in some spinal canal stenosis. However, he acknowledged to health care providers that his back pain was decreased with exercise. Furthermore, he continues to smoke cigarettes against medical advice and declined to consider back surgery or to follow through with prescribed physical therapy.

(Tr. at 23-24).

## 1. *PRIOR WORK RECORD*

Plaintiff's earnings were extremely low from the time he entered the work force until six or seven years later when he joined the Navy. Plaintiff had good earnings while in the military and during the year afterward when he worked rebuilding aircraft. Plaintiff indicated he left that job in August 1998

33

due to his back, and his alleged onset of disability is August 2, 1998.  However, he earned $7,814.00 during 1999, suggesting that his symptoms were not as bad as he claims.  He also worked in 2004 earning more than $10,000 (and, in fact, more than he had ever made prior to joining the Navy), and he was working part time at the time of the administrative hearing.  Plaintiff's ability to work, albeit not at the substantial gainful activity level, suggests that his symptoms are not as bad as he claims.

## 2.  *DAILY ACTIVITIES*

In October 2004, plaintiff reported that he could make phone calls, run errands, research on the computer for an hour at a time, cook, iron, mow, vacuum, do some repairs, go out every day, drive a car, shop once a week, and follow written and oral instructions well.  Plaintiff's wife testified that she does the yard work, but plaintiff did "very little" of it before.  She testified that she takes out the trash, but then added that she has always done that.

In 2003, plaintiff reported that he was a full-time student, suggesting that he is able to do more than he alleges he has been able to do since he claims he became disabled.

Plaintiff's daily activities are inconsistent with the level of disability he alleges, and this factor therefore supports the ALJ's credibility determination.

34

## 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff claimed that his concentration and focus are limited due to pain, yet in his disability paperwork in late 2004 (six years after his alleged onset date), he indicated that he can follow both written and oral instructions well. He also indicated that he was able to spend four years in a vocational rehabilitation program getting up to his senior year in college, clearly requiring an ability to concentrate and focus.

In February 2001, plaintiff was observed to have no memory loss, no depressed mood, and a normal gait. In April 2003, he told Eric Rodgers that he had an episode the end of February 2003 with increased back pain but that it lasted only about two or three weeks. In May 2003, plaintiff told a military disability examiner that his back pain flares up about once a week. In August 2005, plaintiff saw Dr. Perryman for a follow up on depression and stated that he did not desire his chronic pain to be addressed at that time. In September 2005 when he saw Dr. Birk, he said he currently has no problems, but he does have chronic lumbar pain which he has learned to live with. In December 2005 when calling his doctor's office for a medication refill, he said he had "no complaints".

Plaintiff's alleged onset date is August 2, 1998; however, there are no relevant medical records in the transcript dated earlier than September 8, 1999, 13 months after his alleged onset

35

date.  This suggests that plaintiff's alleged onset date is tied to his leaving his job working with aircraft rather than the alleged onset date being tied to any impairment.

Plaintiff had no relevant medical records from September 8, 1999, until February 5, 2001, a 17-month period.  He had no relevant medical records from February 5, 2001, until October 24, 2002, a 21-month period.  He had additional periods with no relevant medical records of four months (October 24, 2002, to February 25, 2003), six months (July 26, 2003, to January 21, 2004), three months (January 21, 2004, to April 30, 2004), eight months (October 18, 2004, to June 10, 2005, during which time he saw no treating physician), and plaintiff did not see a doctor from  September 8, 2005, through his administrative hearing in March 2006, a six-month period.  These long periods of time between medical visits suggests that plaintiff's symptoms were not as severe as he alleges.

This factor supports the ALJ's credibility determination.

## 4.   *PRECIPITATING AND AGGRAVATING FACTORS*

Plaintiff told Patricia Hughes, a nurse practitioner, the his pain is increased from staying in the same position for a prolonged time, without defining "prolonged."  He told Dr. Marcelo, in connection with his military disability, that lying down for a long time, walking for a long time, and standing and sitting too long all aggravate his pain, but again he did not

36

indicate what "too long" meant.  He stated that lifting anything more than 50 pounds increases his back pain; however, he testified that he could lift less than five pounds.

In May 2004, plaintiff told Patricia Hughes, a nurse practitioner, that prolonged sitting and standing and rolling over in bed aggravates his pain.  He did not indicate how long "prolonged" sitting was.

All of plaintiff's allegations as to precipitating and aggravating factors are undefined with the exception of lifting which is clearly contradictory -- his statement that he can lift 50 pounds is certainly contradictory to his testimony that he cannot even lift five pounds.  This factor supports the ALJ's credibility determination.

**5.    *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

Plaintiff testified that his medication causes constipation, drowsiness, dizziness, and forgetfulness.  However, plaintiff never complained of any of these symptoms to any treating doctor with the exception of dizziness which was reported six months after plaintiff's last insured date.

In February 2001, plaintiff was taking nothing other than Ibuprofen for back pain.  In October 2002, plaintiff was taking Ibuprofen only two to three times per week for his back pain.  He indicated that his back pain had improved since he started exercising and following a better diet.  He told Dr. Marcelo the

37

same thing seven months later.  In April 2003, plaintiff
indicated that increasing his exercising and stretching had
improved his back pain.  At that time, he was using only
Ibuprofen, but not even daily, and he indicated he would like to
stop using medication.  Plaintiff was not seen again by any
treating physician relating to his back pain until January 21,
2004 -- nine months later.

Although plaintiff was prescribed Vicodin several times, for
the most part during the eight years he claims he was disabled
prior to his administrative hearing, he sporadically took a
nonsteroidal anti-inflammatory, and he occasionally took muscle
relaxers as well.  The record does not indicate that plaintiff
required strong pain medications on a regular basis, that he
experienced any adverse side effects prior to his last insured
date, and that proper diet and regular exercise consistently
improved his pain.

## 6.   *FUNCTIONAL RESTRICTIONS*

Plaintiff testified that he can sit for about five minutes
before he needs to shift his weight around and that he can sit
for only 15 minutes at a time.  However, his mother noted that
plaintiff can sit through a movie, although he is in pain by the
time the show is over.  Furthermore, plaintiff consistently told
his doctors that only "prolonged" sitting causes increased pain.
Prolonged means "continuing for a long time; lengthy."  Prolonged

38

cannot reasonably be interpreted to mean 15 minutes. Finally, plaintiff stated in his disability paperwork that he routinely does computer research for an hour, indicating that plaintiff is able to work in a seated position for much more than 15 minutes at a time.

Plaintiff testified that in 1998, at his alleged onset date, he could have sat for about a half an hour at a time. However, after his alleged onset date, plaintiff was able to attend full time college classes, getting to within 30 hours of completing his degree, suggesting that plaintiff was able to sit for longer than a half an hour at a time.

Plaintiff testified that he can lift less than five pounds frequently and about five pounds occasionally. He also testified that in 1998, he could lift a couple more pounds than now, but not much more. However, in May 2003 he reported to Dr. Marcelo he could lift up to 50 pounds.

No doctor has ever recommended that plaintiff limit his sitting, standing, or walking. In fact, plaintiff's doctors have consistently recommended that he exercise, and physical exercise has proven to improve plaintiff's back pain (Tr. at 147-148, 179-182, 185-187, 241-246).

This factor supports the ALJ's credibility determination.

39

## B.   CREDIBILITY CONCLUSION

In addition to the factors discussed above, I point out the following.  In plaintiff's disability paperwork, he indicated that his credit history was preventing him from being self-employed, not his impairments.

Plaintiff testified that he fell about two or three times a month due to his impairment (which is why he purchased a cane); however, there is no mention in any medical record of plaintiff ever falling.  Nor is there any recommendation by any doctor that plaintiff utilize a cane.

Despite having been warned repeatedly by his doctors of the dangers of smoking, plaintiff continued to smoke during all of the years covered by these records.  In addition, he repeatedly declined medical assistance to quit smoking.

Plaintiff was directed to participate in physical therapy three times during the course of these records.  Twice, he simply never called to schedule an appointment and the referral was canceled.  One other time, he went to physical therapy one time, on the second visit he reported improvement, and then he never showed up again and never called.  Plaintiff's failure to participate in physical therapy as directed by his doctors suggests that his pain is not as bad as he alleges.

Plaintiff's back pain was noted as being stable on multiple occasions (Tr. at 147-148, 152-153), and his gait was observed as

40

being normal on every doctor visit with the exception of plaintiff's visit to Dr. Ballard who was examining plaintiff in connection with this disability application and on his first physical therapy visit from which he would soon go AWOL (Tr. at 141-142, 179-182, 185-187, 228-229, 237, 241-246, all indicating normal gait).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disabling pain are not entirely credible. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VII. RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Next plaintiff argues that the ALJ's residual functional capacity ("RFC") assessment is not supported by the evidence. Specifically, he cites the opinion of Dr. Ballard who observed that plaintiff had difficulty doing a squat and difficulty getting on and off the examining table.

The ALJ is only required to rely on those impairments which she finds are credible and supported by the record and is not obligated to rely on limitations not supported by medical evidence. Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996); Lorenzen v. Chater, 71 F.3d 316, 318 (8th Cir. 1995). In this case, the ALJ relied only on the evidence she found credible.

41

With respect to Dr. Ballard, I note the following.

1.  Plaintiff reported to Dr. Ballard that he experiences numbness in his legs from sitting.  However, he never complained of leg numbness to any of his treating physicians or nurses.

2.  In Dr. Ballard's office, plaintiff had difficulty doing a squat.  However, plaintiff had no difficulty doing a squat in other offices (Tr. at 134-135, 149-150), and in fact indicated in May 2004 that squatting actually helps his pain.

3.  In Dr. Ballard's office, plaintiff was observed with a slow gait.  However, in every other doctor's office, plaintiff's gait was normal (Tr. at 141-142, 154-159, 179-182, 185-187, 237, 241-246).  Because plaintiff was seeing Dr. Ballard in connection with his application for disability benefits, this discrepancy in his gait suggests that he was exaggerating his symptoms in Dr. Ballard's office.  This also suggests that his reported difficulty getting on and off the examining table may also have been exaggerated.

4.  Dr. Ballard was asked on the form to describe plaintiff's ability to sit, stand, walk, lift, carry, handle objects, and travel, but he wrote only, "see letter."  The letter contained only the conclusory statement that plaintiff "seems to be quite impaired and would have difficulty doing jobs requiring prolonged sitting or standing.  He would have difficulty doing bending activities or carrying loads."  Despite this very vague,

42

conclusory language, it is not inconsistent with the RFC assessed by the ALJ. An ability to sit for 30 minutes at a time before being allowed to stand up is not a violation of Dr. Ballard's opinion that plaintiff cannot do "prolonged" sitting or standing. The ALJ found that plaintiff cannot bend. And the ALJ limited plaintiff's lifting to ten pounds, certainly not anything beyond "load", the term used by Dr. Ballard.

The ALJ's RFC determination is not at odds with plaintiff's own allegations everywhere except at the administrative hearing. Plaintiff wrote in his disability paperwork that he can research at his computer for an hour. He told Dr. Marcelo that he can lift up to 50 pounds. He never complained of increased pain to any doctor beyond the pain he felt after "prolonged" sitting or standing.

Based on the above, I find that the ALJ's RFC determination is supported by the substantial credible evidence in the record as a whole. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VIII. REQUIREMENTS OF JOBS PLAINTIFF CAN PERFORM

Finally, plaintiff argues that the jobs which the ALJ found plaintiff can perform require abilities that exceed those the plaintiff retains, according to the ALJ's RFC. Specifically, the wire patcher position requires level 2 reasoning, or the ability to carry out detailed but uninvolved written or oral

43

instructions.  Judge Carter limited plaintiff to performing only simple instructions.  The food and beverage order clerk requires the ability to deal with people, and the ALJ limited plaintiff to minimal public contact and no customer service.

Social Security Ruling ("SSR") 00-4p requires the ALJ to identify and obtain a reasonable explanation for any conflict between occupational evidence provided by a vocational expert and information in the Dictionary of Occupational Titles ("DOT"). "When there is an apparent unresolved conflict between the [vocational expert] and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert's] evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p.  In this case the ALJ did ask the vocational expert about any conflicts with his testimony and the DOT.  There were no conflicts; however, the vocational expert testified that the DOT does not address the need to alternate sitting and standing at 30-minute intervals (Tr. at 297-298).  The vocational expert relied on his 20 plus years of experience in testifying that these jobs can be performed with a sit/stand option (Tr. at 298).

The ALJ was justified in relying on the vocational expert's testimony in finding that plaintiff is able to perform other jobs in the national economy.  See Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); Trenary v. Bowen, 898 F.2d 1361, 1365 (8th

44

Cir. 1990). Furthermore, I note that the ALJ's finding that plaintiff is limited to work that is simple and repetitive in nature and involved minimal public contact and no customer service contact is not supported by the evidence and can be seen as nothing more than the ALJ giving plaintiff the absolute benefit of the doubt. There is no credible evidence that plaintiff is limited in these respects. In fact, plaintiff stated in his disability paperwork that he has no difficulty following written and oral instructions, and he was able to complete all but 30 credit hours of a four-year college degree in computer science after his alleged onset of disability. There is no credible evidence in this record that plaintiff is limited in his ability to work with the public or in customer service or that he is limited to carrying out only simple instructions.

## IX. CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 28, 2008

45